First case of the morning, GN Netcom Inc v. Plantronics Inc, Chris Theodore. Good morning, Elizabeth Theodore on behalf of the appellant, GN Netcom. And I'd like to reserve three minutes for rebuttal. GN brought serious antitrust claims against a monopolist. Yeah, yeah, pull just a little closer to the microphone, if you would, please. GN brought serious antitrust claims against a monopolist in the headset market. And it just wanted a fair chance to prove its case to the jury. But Plantronics made that impossible. The spoliation in the cover up here was as bad as it gets. It was an assault on the integrity of the judicial system. And courts overwhelmingly imposed default judgments on liability. All right, let me stop you right there. You've just used the word overwhelmingly, courts overwhelmingly. And in your brief, I believe you referred to a consensus of opinions. That's not correct, is it? That is correct, Your Honor. Consensus of opinion, how do you define consensus? We have not seen a case, and Plantronics has not cited a single case in which it contends that a court imposed anything less than a default judgment in a case where the spoliation extended to the same, the number and the scope as it was here. How many of those are precedential opinions? I looked at your string site, and it appears that most of them are district court decisions. So most of them are district court decisions. Fewer of them are court of appeals decisions. So isn't there some tension then, some inherent tension? Given the standard of review that we have here of abusive discretion, that we have cited for us non-precedential opinions, exercises of discretion by district court judges, largely. You're urging those upon us, but a district court judge in Delaware exercised his discretion in a manner contrary to what you urged upon him and what you're suggesting now should have been imposed. One judge does one thing, one judge does another, based upon all the circumstances that are before him. So there are several of the cases are court of appeals cases, for example, a Ninth Circuit case. But I think it's important when you're analyzing... Could you speak a little louder? Of course. That tilts it down. That microphone doesn't... The microphone cannot be... No. So we have new modern equipment and it doesn't work very well. It doesn't work. There's no bidding to contradict. I'll try to speak louder, Your Honor. Thank you. So the court in analyzing an abusive discretion has to look at the district court's reasoning. And let's look at the district court's reasoning. So the four factors in Schmid are degree of fault, degree of prejudice, and the court found there was a high degree of fault and very serious prejudice. And the court cited Schmid and set forth the requirements that Schmid set out, right? And that's correct. But the last two factors in Schmid, the question is whether there's a lesser sanction that avoids substantial unfairness. And the court's only... Not whether. Not whether there is. In fact, our jurisprudence encourages going to the least restrictive alternative, right? Right, Your Honor. Right, Your Honor. And what the judge said here, the only thing that the court said about why an adverse inference would avoid substantial unfairness was that since some of the content of the deleted emails had been recovered, the jury could make reasonable inferences about the likely content. And that's wrong. Couldn't it? Couldn't it? Are you suggesting the jury could not draw such reasonable inferences? I'm suggesting that the jury would just be guessing. And that's what the district court said later. The jury would have to make its best guess. And there was no evidence there that would have supported the drawing of an inference? I'm saying that there was... A jury speculates when there is no support for the drawing of an inference. Wasn't there something within those 17 facts that Judge Stark gave to the jury from which a reasonable inference could have been drawn that there was intentional spoliation here? There was absolutely extensive evidence supporting the fact of drawing the inference. The problem is that the jury didn't know... That's what juries are for. This judge decided, I'm not going to make this determination. I'm going to do what our system usually, almost always, requires. And that is that we let the finder of fact, the jury, make this determination. And I'm going to give them some stuff from which they can draw that inference. Wouldn't you love, as a trial lawyer... And I don't know whether you tried this case or whether someone else did. I can tell you, I would love to go in front of a jury, having even those several facts among the 17, and argue to them about what this terrible person, Houston, employed by this terrible company Plantronics did in the wake of this hold. Isn't that pretty powerful? Do you think a jury is going to ignore that? I think the jury had plenty of evidence from which it could have said that it should draw an adverse inference, but the problem is that it didn't know what the emails, the destroyed emails, would have said. And the scope of the destroyed emails was so extensive, it could have gone to any of the issues in this case. Well, what attracted the stipulation into your answer? Because I understand that there was a stipulation, and there's some dispute about, I guess, the neutrality of the stipulation or the extent to which the stipulation gave the jury enough information to reach that finding. And whether or not there was some evidence, wasn't there, on the fact of the spoliation? I think Gavin testified on your behalf. But was the evidence from your submission sufficient to allow the jury to be fully informed to make the kind of finding that you're asking? It was not, Your Honor. And that's sort of the second and third argument in our brief, which is that if the district court's theory of this case was that the jury had to decide the extent of the bad faith and the extent of the spoliation, it was an abuse of discretion to exclude the facts that would have supported that determination. And the district court basically said that the facts that we wanted to provide to the jury would be too inflammatory. And that's completely inconsistent with the district court's theory in awarding the adverse inference. Is there any more quintessential area of discretion to exercise by a trial judge than a 403-type ruling which says, I am not going to let this proceeding morph into something else. I'm not going to allow a collateral issue to distract the finder of fact from the merits. Wasn't that what the district court explicitly said he was doing, or was not going to do here, rather? That is, this is an antitrust case. An antitrust case is not the stuff of an ordinary citizen's regular day-to-day activities. And so rather than allow the trial to move from the issues relative to the antitrust proceeding, he was going to abbreviate rather than get into an extensive, more than mini-trial. Isn't that what discretion is all about? Not when the district court's rationale for doing an adverse inference in the first place was that the jury had to decide whether there was a massive cover-up. If the district court says, I'm going to let the jury decide whether to apply the adverse inference, the jury has to be given the facts. Didn't the stipulation include the divergent opinions of the experts here in a very abbreviated fashion? Didn't the jury have before them essentially what one expert estimates and what another expert estimates? No, Your Honor. So first of all, in the fact that the district court read about the number of deleted e-mails, what he said was that it's possible that the number of deleted responsive e-mails was a few hundred or even less, or that it was 15,000. That a few hundred or even less, no expert said that. Plantronics expert, its lowest estimate was 952 responsive unrecoverable deleted e-mails. So that was just wrong. And more broadly, Your Honor, what the district court said was that the parties couldn't agree about the number. And when the parties can't agree about the number, the thing to do is allow them to present evidence, so that their experts can present evidence that the jury has a basis. That's precisely what the court was trying to avoid here, wasn't it? I mean, he was saying we don't want to get into a trial on this collateral issue and have evidence presented at length, a battle of experts who would have been at odds. There was some commonality in their opinions, but that's what he was trying to avoid. That's true, Your Honor. And that's an abuse of discretion where you've said that the reason we're not going to do a default judgment is that the jury has to decide whether to apply the inference. And so there has to be – my client had to have the right to present the relevant facts that showed bad faith. The fact that the district court found the CEO made misrepresentations under oath about the recovery efforts, the jury never knew that, and that was central. These were all of the facts that the district court relied on. Let me ask you one other question about what occurred here per the district judge. You were invited by Judge Stark to seek certain evidentiary restrictions, weren't you? Yes. And you chose not to. That's incorrect, Your Honor. We did move to exclude evidence, and later on in the district court denied it. But more importantly, Your Honor, we – What were they? I'm not recalling them. We said it in your brief, Your Honor, but we – I'm sorry? We cite the page numbers in our brief, but we moved to exclude evidence. We moved to exclude testimony by their experts about, for example, the number of Plantronics-only distributors because a lot of the destroyed evidence would have gone to that number. There was a lot of disputes about it. We moved for other evidentiary sanctions. Did you seek to do any additional discovery after the ruling? So the district court held in its sanctions opinion that additional discovery would not redress the prejudice. It considered that as a – Would not. I'm sorry. Would not redress the prejudice. That's what the district court said. It's at JA32. He considered the potential for additional third-party discovery and said that it would not redress the prejudice to us. And, Your Honor, I want to go back to the deterrence question because the Schmid case says that deterrence in cases of serious fault, which this was, deterrence is a key factor to consider in doing a sanction. And Judge Stark explicitly considered it. Not at length, but he explicitly considered it per Schmid. He did not, Your Honor. He cited deterrence, but he didn't analyze it. Well, that's what I just said. Not at length, but he explicitly considered it. Citing it, mentioning it, seems to me to be an explicit recognition of the existence of that factor. This Court has said in cases like Sandant that a district court exercising its discretion has a duty of explanation. And the district court did not explain how anything other than a default judgment here would deter future misconduct. And I think it's important also to think about the fact that Plantronics, its CEO, and its lawyers, they refused to investigate. They knew that other high-ranking executives besides Houston deleted emails, and they refused to investigate. And the adverse inference sanction here simply rewarded them for that refusal to investigate because if the jury doesn't know how many emails these other people delete, it's not going to apply the adverse inference. And, you know, courts... You... It's not... The drawing of the adverse inference, then, according to you, is dependent upon the extent and volume of the exfoliated emails? Is that what you're suggesting? Yes, Your Honor. That's certainly a very important factor in drawing the adverse inference. You don't think that this jury of folks exercising their common sense are not going to conclude when they have been instructed by the district court that there have been certain emails destroyed, deleted, in violation of the litigation hold? They're not going for the worst? They're not going to be suspicious? They're not going to have a basis to draw an adverse inference? The jury was told that some number between, you know, a few hundred or less and 15,000 responsive emails were deleted, and the parties couldn't agree. That's all quantity.  You've told us that a number of times. But I am talking about what we expect from finders of fact, folks selected for a jury who bring their common sense, everyday experiences, and they have been told explicitly that the defendant here, defending against this antitrust action, has destroyed evidence. And they're told that it may be suggestive of an improper motive, and that they may properly infer that. You don't think that those folks aren't going to be pretty suspicious, based upon what they've been told? I think that we were entitled to present the best evidence that we had, just like for any other factual dispute in this case. We should have been entitled to present the best evidence to convince the jury to draw the inference in the district court. This was all concededly relevant evidence. It was not unfairly prejudicial, because the whole question in the case... It just seems to me, I know there was a lot you weren't able to present, because you didn't have it. You couldn't get it. But you were able to present your case. You were able to present and support your allegations of monopolization. You had ample testimony there. It looks to me that you almost didn't even fight the fact that they went out and they had this system where they made sure that their distributors only dealt with their headsets. I don't know what else you were going to pile on top of that, other than to say these people were bad people in a discovery sense. Well, Your Honor, I mean, some of the key disputed questions were whether the distributors were really free to terminate these agreements. And imagine that one of the destroyed emails said, you know, if you don't agree to this, we're going to cut you off. Plantronics has 80% of the market. They're in charge of this plant. But wasn't your testimony to that effect? Some of the emails were pretty close to that. But imagine there were 20 more emails, one for each distributor. Or imagine there were emails literally reporting on conversations with distributors saying, you know, I went and I told them we'll cut you off if you don't agree to become a PAC. That would have been incredibly important evidence for the jury. And that's why court after court, and I realize many of the cases we set are district court cases, but if you read them, they all say that you can't have a fair trial where there's been spoliation to this extent. If I could save very many time for rebuttal. Any other questions? I've been kind of novelizing this conversation. I can do that in rebuttal. Thank you. Mr. Dean? Yes, Your Honors. May it please the court, Chief Judge Smith and Your Honors, John Dean for Appellee Plantronics, Inc. The evidence at trial established that the alleged de facto exclusive dealing arrangements in this case, the POD agreements, were not anti-competitive nor substantially foreclosing. The evidence, which Judge Stark referenced in his order denying a due trial. It may well be they did not sufficiently establish the foreclosure element of it. How can you say that the PODs were not anti-competitive when you have agreements telling one of your distributors, look, you can't distribute anybody else but ours? There was some discussion because somebody brought a jabber, I guess it was, representative into Comcast, and there was some problem that arose from that. How can you say they weren't anti-competitive? That doesn't necessarily mean that they win the case, but how can you say that they weren't anti-competitive? Well, the evidence, Your Honor, was number one, the POD agreements were easily terminable. So the terms of the agreement allowed those arrangements, the exclusive dealing arrangements, to end at any point in time. Secondly, the evidence. So you're saying they weren't really contracts? The obligation was illusory? The obligation wasn't illusory, but it wasn't that these PODs were being coerced into entering these agreements and then could not end it at any point in time. The testimony at trial overwhelmingly, every third party that testified, PODs and non-PODs, testified that they were not coerced, they were not forced to enter into these arrangements. And what advantage do they have by entering into it? If I'm saying I'm stapled or OfficeMax, why would I enter into such an agreement if I have no, if it's not to my company's advantage to do it? Well, it does create relationship building. There is a synergy, as the testimony was at trial, Your Honor, particularly in this particular area of the economy. We have headsets, have very unique features. By having the synergy, this relationship building, a loyalty with a reseller, that value-added service that the reseller can provide by having the exclusive dealing arrangement is furthered by that relationship. There are sales leads that are provided to those individual PODs because of that level of loyalty. There is restocking that occurred under the agreement so that there was ample opportunity, if there were warranty issues or the like, for those PODs who had direct relationships with the individual consumers to, again, build that relationship. And yours is the largest headset, I assume, in the market. Is that right? It does by relative share, that's correct, Your Honor, in the U.S. market. Worldwide, by the way, they were equal. The U.S. market, Plantronics were. I'm the OfficeMax, or Staples, and I have all these advantages that you've just laid out. Why would I want to risk that by letting this company called GN with these little Jabra headphones? Why would I want to get in bed with them if I'm going to risk my relationship with Plantronics? Well, the agreements did not preclude the – I didn't ask what the agreement precluded. I'm asking you if I'm a vendor. Why would I want to risk that? Risk losing the relationship? With Plantronics. You wouldn't risk losing the relationship by selling GN product. In fact, some of the POD resellers, two of them, were top 10 GN resellers. That was unrefuted evidence in the record. PODs did not restrict anyone's ability to or suggest negative repercussions if a vendor did engage with GN and sell GN headsets? Well, I would answer that two ways, Your Honor. I would say, number one, the evidence at trial was that there was no coercion of PODs to remain PODs nor coercion of non-PODs who also testify. Okay, but that wasn't the question, as I understand it. Yeah, coercion is a red herring. That word doesn't get us anywhere. And then secondly, under the terms of the agreement, the agreement itself only precluded direct buying of GN product from GN. I thought there were also preclusions about advertising other businesses, including GN's product. There weren't restrictions of that kind? There were restrictions, which in the pre-2014 agreements, Your Honor, there was an amendment in 2014 where both the direct buying restriction and that advertising restriction were changed. There was substantial testimony also about how that didn't impact any causation. But that was after the period involved in this complaint, was it not? That was after the complaint was filed in 2014. That's correct. For the time period prior to that, for the agreements that were entered into pre-the amendment, there was a direct buying restriction, and then the second restriction, Your Honor, correct, there was a marketing restriction, although the testimony was there wasn't a form of significant policing, for example. So you could have a Jabra over in the corner. You just weren't able to advertise it. You could sell Jabra. Right. And they were the well-known product. Same question. You could have it over in the corner, which is selling it. Just don't advertise it. In essence, you would not put it into your catalog, for example.  Well, not buried in that sense, Your Honor. And the reason why I would differentiate it from that type of example is all the end users that testified at the trial, Quicken Loans, for example, and Shell Failful, they were well aware of the headsets that were available. It's not like they were – How could they not be? I'm aware of the headsets that are available. Everybody in this room, I'll bet you, is aware of the headsets that are available. The fact that they're aware of the headsets that are available doesn't mean much. In this age of electronics, everyone in the universe might – well, she's two and a half. My granddaughter is probably an exaggeration. In a few years, she'll be aware of the headsets that are available. Yes. Everyone's aware. That doesn't help us. Well, that was GN's theory at trial was that these agreements were anti-competitive because people did not know that the GN Jabra brand headset was, quote, on the menu. And all the evidence at trial was these are very sophisticated end users and buyers that are buying this product. No disrespect to the two-and-a-half-year-old. But these are folks that they really know what they're sourcing. They really know what they're buying. They don't need a catalog. They don't need that type of information and marketing to them. They know what's on the menu. And we even specifically asked, as I tried this case down below, Your Honor, we asked that very question of the end users to testify. Were you aware of GN product? Were they on the menu? And they all said they were absolutely aware. What does on the menu mean? In other words, they knew it was there. They were fully aware and understanding that a reseller could source and in most instances did source both GN and Plantronics products because they were both the dominant headset products and are the dominant headset product in the market. You know, one thing that strikes me in the argument today, it really hit me when I read the brief. Given what happened here with the perjury of the CEO, I don't think that's too strong of an unfair statement given the testimony and what happened at the depositions. Given the incredible path of destruction and spoilers that occurred here, I would think there'd be some inkling of contrition or there'd be something about the brief that would be conciliatory. Nothing. In fact, your first sentence in your counterstatement of the case, despite GN's focus otherwise, this is an antitrust case. Well, that's exactly their argument. In the closing argument, you hit them with the fact, look, they're trying to divert your attention and make this into a spoilation case. This is an antitrust case. That's exactly her point. They were put into this bind where in order to try to bring to the jury's attention what happened here, they opened themselves to the argument. They're trying to take you right off the ball. This is an antitrust case. The appeal is not an antitrust appeal, despite the representation in your brief. It's a spoilation appeal. The only issue here is the abuse of discretion of the district court given the correlation that occurred. So when you say, despite GN's focus otherwise, this is an antitrust case, it just hit me that what would have been nice if there was a little more contrition, if it was a little more conciliatory given the incredible conduct that happened here, lies to a court by attorneys, by CEOs. I don't get the feeling that Plantronics is the least bit bothered by that. Well, as the trial lawyer below and then the appellate brief writer, I apologize if that did not come across your honor. It's a very ugly picture, isn't it? Well, what I would say, your honor, is, and I would first start this way. We're not defending, and I was in counsel at the time of the spoliation issue. We came in to try the case, your honor. Well, your name's in the brief. You know, yes. He wasn't there at the trial level. At the time of the spoliation, that was in the counsel, and we came in. Okay, I'm not accusing you of that. I'm just saying, it's the brief I'm looking at. I know that you were not involved. I'm assuming you weren't involved in what happened before. And Plantronics absolutely does not defend the actions in the sense of that it believes what Don Houston did was appropriate. There was a litigation hold. He violated that hold. It was an improper act on his part to delete those emails, and Plantronics was significantly sanctioned. I would submit by the court for that. The court did not take it lightly. Let me ask you this. I couldn't find the answer in the record. Did the jury learn that your client was sanctioned? Correct? The jury was told that there was a sanction. Did they learn what the sanction was? The amount was not told to the jury. Okay. That's correct, Your Honor. But they were told. There was a sanction. Both in the pretrial instructions and in the spoliation stipulated facts, that there was an intent to deprive by Don Houston and that this adverse inference is, in essence, being ordered as a part of that sanction, so to speak. As a part of it. I think you're asking about the monetary sanction. But the monetary was not referenced. The monetary, but the court indicated there was a sanction that included the permissive adverse inference. That is my understanding as to how the pretrial instructions were worded, Your Honor, that there was intent to deprive. I believe the court even used bad faith and that they had been prejudiced and that these stipulated facts are as a result of that spoliation. And they were directed that spoliation had, in fact, occurred. Your Honor, you're a liaison. Let me get to a point that I think is an important aspect of this case. The 403 balancing. I don't see in the record that the district court did an explicit balancing test when they determined that the spoliation testimony, particularly Gallivan's testimony, would not be permitted. Do you agree with that, that they didn't do an explicit balancing test? What I would – I don't completely agree with that, Your Honor. The reason why is the request for Gallivan to testify at trial was never made. So to answer your question, an explicit – Well, it was made. There was not a – Our argument was he wasn't on the pretrial statement. Our argument was at the August 22, 2017 hearing that after they represented, there would be one to two hours of spoliation testimony that would be introduced to the jury. That was their proffer even after the July hearing, that we wanted to be heard and we wanted to brief the issue of the extent to which Mr. Gallivan would, in fact, testify. Because in part, one of his affidavits had already been stricken by the court under the Pennypack factors. Then after that, there was never a point in time where trial counsel stood up and said, I'd like to call Mr. Gallivan to the stand. So there was never an opportunity for the court to explicitly – What about the brief that was filed? They filed a brief that reiterated their desire for live testimony. There was a brief that was filed after the July hearing. Right. Two things I would say to that, Your Honor. Number one, to have indicated in a footnote – it was in a single footnote – that they believe that they had preserved in an issue. I'm not aware of a case that says that is sufficient under 103 for preservation of the issue. But I would say, secondly, that reference is not about Gallivan testifying. That was a statement about preserving the issue of objections to the general use of the stipulated facts and their desire to want to do all of it through witness testimony, not stipulated facts and some witness testimony, which is how the court ultimately ended up proceeding in his discretion. So I would argue just still further – I apologize, Your Honor – is even if it wasn't explicitly considered, it most certainly was implicitly considered in the sense that the court made clear did not want spoliation to overtake the trial, did not want there to be unnecessary delay, and, in fact, the stipulated facts were going to solve that problem because there was such a substantial amount of those facts that were going to be included there. And this court has for decades in the 403 context often done the 403 weighing itself where the district court has failed to do so. Under force, Your Honor. For good or ill. That's what we have so often done. In the course of discovery, was there anything that was unearthed with respect to communications from Houston or other salespeople or employees at Plantronics with respect to the pods? I mean, I understand that if there was destruction of the Houston e-mails, you can't get them at that end. But what about at the end, how about the recipient, the addressee? Two important points, I think, Your Honor, with respect to that. There were 42 other Plantronics custodians. That's where the police delete e-mails that the court found was the evidence that was available for the jury to make the inference. That came from the other custodians. So there was evidence on the other side, as you said, that was available. I think an important second point is with respect to the third-party discovery in this case. There were 175,000 documents that were produced by pods and non-pods in this case. Don Houston was on 99 of those e-mails. By my math, that's .057% of the e-mail production was e-mail where Don Houston was to, from, or cc'ing on that third-party e-mail. Their theory is he was extensively coercing all of the third parties, so there would be all this information, supposedly, in the third-party coppers to prove that. And it just didn't. At the risk of seeming to oversimplify are the two positions of the parties here. Polar positions, that is, the plaintiff saying there simply wasn't enough evidence or facts, since these were stipulations read to the jury, presented to the jury to allow them to make a reasonable inference. And your position that there was some, and that's sufficient, and the sum, the amount that was provided, was a determination made by the district court, and it therefore did not abuse its discretion. Does it really come down to that simple a calculus here? I would add something more to that, Your Honor. In addition to that calculus, our position is that the court did, in fact, even beyond the 17 stipulated facts, which were very powerful facts, there was substantial evidence that they were permitted to introduce at trial. They cross-examined Dr. Ratliff with respect to spoliation. They asked Plantronics witnesses about spoliation, e-data, alleged secret pod-related issues of salespeople's Kristen Bowser, of Boris Seabird. There was, of course, the e-mails that were marked and introduced into evidence, the please delete e-mails. There was significant evidence, is my position, Your Honor, not just the stipulated facts but evidence that they were permitted to provide and submit or for whatever reason chose not to that Judge Stark also made available to them that was a part of the record from which the jury could, of course, make the inference. In balancing all of that, I think what is important, this is a JA-54 that Judge Stark had done here, Your Honor, is in his new trial order he summarized all the evidence, which is why I believe the antitrust merits are important in this particular case. In doing that particular balance, he found after looking at and considering the substantial evidence Plantronics presented at trial as well as the evidence G.N. did not present, evidence that would have come from G.N.'s own files if such evidence existed, the only reasonable conclusion is that G.N. was not substantially prejudiced. Hence, even if there was some bit more evidence. The prejudice is based upon failure to establish sufficient foreclosure? He meant prejudice in the sense as to their argument that they wanted to put in more spoliation evidence. The court said as to all the elements, the evidence was so overwhelming. The additional evidence would have gone to, I assume, establishing foreclosure. The evidence that what, Your Honor? They're saying they didn't have access to because of the spoliation would have gone to the foreclosure element, I'm assuming. Foreclosure and coercion wrapped together, and the court's point is the evidence was so overwhelming and substantial so any error, if there was any error, would most certainly have been harmless. Let me ask you one question here about the Schmidt factors. Yes, Your Honor. Didn't the district court misstate the law when it evaluated the lesser sanctions? The district court seemed to evaluate what the impact of a lesser sanction would be on Plantronics, your client, whereas it seems to me that Schmidt said that you should look at what the lesser sanction, what the impact would be on GN. I think given the court's ruling, Your Honor, he did fashion that particular substantial unfairness factor. Yes, while he was considering fairness to Plantronics, which I would submit that's the whole point of fashioning the least sanction possible, the court was also looking to try to fashion something that was fair to GN. Hence why it invited and permitted GN, for example, to file and submit any evidentiary sanction that it sought on a wide-open field. There was no limitation to that particular type of sanction. In making that finding... As long as that did not take over the trial. No, what his ruling was on the sanction, Your Honor, was they could seek whatever evidentiary preclusion on a merits-based issue, on any issue. There was no limitation to it in the context of further... I thought the way of helping with that... I don't want to go too far because you realize we've got a number of cases. But what evidence... Given the nature of the issues involved, what evidentiary sanction would have gotten the kind of information that they're complaining deprived them of fair case? I didn't say that very astutely, but I'm trying to get at... I'm wrestling with the kind of evidentiary sanction that would work in this kind of a case. I have a hard time finding any. Well, I would look to what they're requesting now for the first time with respect to the mandatory inference. Their argument is that Don Houston's... Well, I started with that question and you said, no, that's not what's at issue here. What's at issue here is an evidentiary sanction. That's where I thought... No, that isn't... And my point is the requested relief that they're making on the mandatory inference, I think, is informative of answering your question, Your Honor, which their whole argument is the information that was destroyed that was in Don Houston's email would have touched on the issue of coercion and would have touched on the issue of foreclosure. In other words, strong arming of the PODs. Our argument is the evidence doesn't demonstrate that. But that would have been the type of... The evidence that was left doesn't demonstrate that. That would have been the type of evidentiary sanction that they could have sought pretrial and asked for. Now, of course, we would have vigorously denied that because they took third-party discovery and then shut it down. It's the Joint Appendix, page 566, when they didn't get the answers from the PODs that they wanted. They wanted to hear that they were being coerced, and the overwhelming evidence was that they were not. Do you need to say to that again? I believe it's 566, the Robert Corp declaration that was filed in connection with the sanctions motion, Your Honor. And the important point there would be, Your Honor, I'm just using that as an example, that if there was some information that had come to light during the course of third-party discovery and had they not abandoned it, that was precisely what Judge Stark was fashioning as a further sanction beyond the $5 million and beyond the adverse inference that they could have taken advantage of before trial. They filed one motion, and they abandoned that motion during the course of the July hearing. The Supplemental Appendix only goes to page about 110. You said page 566? Of the Joint Appendix. You might be looking at the Supplemental Appendix that was filed shortly thereafter, Your Honor. Opposing counsel argues that there's a consensus out there that a default judgment should be issued, and I think Chief Judge Smith accurately questioned whether or not the jurisprudence constitutes a consensus. But I have a hard time believing that there can be a much worse example out here than the example that your clients gave in how they dealt with the evidence. I mean, if there's any meaning to our rules on discovery, why wasn't the default judgment the right remedy here? I mean, this wouldn't be the first court that granted a default judgment. It might not be a consensus, but we certainly wouldn't be the first court. I would answer that in the following five ways. Number one, the where opinion, I believe, is instructive here. Because this court now thinks, or another court thinks, that another remedy was the more appropriate one does not mean that the court abused its discretion. I would say, secondly, in the context of the cases, the vast majority of which were outside of this circuit, district court cases, Your Honor, those involved product defect, product liability cases, were the most central piece of evidence. For example, the battery in a battery defect case, a car in a crash worthiness test product liability case were destroyed. Where the court in those cases found, for example, that it was unquestioned, without any question at all, that the most central evidence had been destroyed. There was no such finding here. In fact, the court found the opposite. And the court found the opposite in distinguishing the Micron case, which was a case in which there were 700 bankers' boxes of documents that had been destroyed, District of Delaware. And the court said, unlike that case, we actually have some of the email that's been recovered, or was actually produced in other Plantronics custodians' email boxes, because of the extent to which Plantronics produced 4 million pages of documents, and because of the third-party discovery that was also available in this case. So, while I'm not defending the spoliation, Your Honor, as to what Don Houston did, I do believe this case is much different than a lot of those other cases. One of the cases that they actually cited to, I believe, is instructive here on how there is no routine. This is a highly discretionary, highly deferential rule that's left to the district courts. It's factual and it's particularized. The Mossade case from the District of New Jersey in 2004, that was a patent case in which there was no litigation hold, not our case. Then, because there was no litigation hold in a patent case, there were no technical emails that were actually produced in that particular case. And that court only ordered an adverse inference. So, while, again, I'm not defending Mr. Houston's actions, he violated a litigation hold, should not have been done, but in the context of Rule 37, and in the context of a court trying to fashion a remedy that it believed was appropriate under the circumstances,  nor that the judge abused his discretion in fashioning the remedy under such a discretionary rule as he did. Thank you, Mr. Dean. Thank you, Your Honor. Ms. Theodore. Ms. Theodore, if we do not agree with you that there's a consensus here upon which we can rely, are you asking us, would you ask us to shape some kind of rule that ought to apply? Or, if we cannot do that, how can this court provide any kind of guidance to the district courts as to when, for lack of a better term, enough is enough? Yes, Your Honor. Look, I think what the common thread, and you may disagree that there's a consensus, but the common thread in the cases is that if there's wide-ranging destruction in bad faith, and it's a complex case, the destroyed evidence goes to a wide breadth of topics in the case. The destruction goes to the highest levels of the company. There's a cover-up involving the CEO and the lawyers, and they engage in what the district court found was repeated obfuscation and misrepresentation for over a year. They fail to investigate so that the jury doesn't even get information about the total extent of the destruction. I think the court should say that, in that circumstance, it's an abuse of discretion not to award a default. And this court has an important role to play. The issue of sanctions goes to the integrity of the judicial system and the entire discovery process depends on good faith. I think we, no, I don't think, I know we all understand that. Absolutely. And knowing Judge Stark, I'm sure he was keenly aware of it. Absolutely. One legal principle, jurisprudential principle, that I don't think anybody has mentioned up to this point, but ought to loom large here, maybe it's even the elephant in the room, our system has a very, very strong preference, if you will, for deciding cases on the merits as opposed to default. How does that play into the equation? Plantronics made that impossible. It was impossible to decide this case on the merits because Plantronics destroyed the evidence that we would have relied on. And Mr. Dean said that some of these other cases involved physical evidence. Many didn't. And the bottom line is, in a complex antitrust case, emails are the most central evidence. Emails are what Plantronics, GN's emails, were what Plantronics was relying on to prove its case to the jury, but we didn't have that chance because they destroyed the emails, and especially in a case involving a monopolist, right, where, you know, they suggested, why don't you go to the distributors? But the distributors depended on Plantronics for their supply. They weren't going to testify orally that Plantronics was coercing them. And the fact that, you know, some of these emails didn't turn up in the files of the third-party distributors, that's because the evidence that we have shows that Houston was telling his subordinates to call them up and to threaten them. To threaten them? Yeah, I mean, so. Threaten them in terms of sales or in terms of the spoilation? To threaten them in terms of sales, so to threaten distributors. Distributors who were talking or who had worked with GN, there's evidence in the record where Houston says, you know, maybe I'm going to call up this distributor and tell them we're going to look for someone more loyal. Can you please give us a 28-J with the citation to that? Absolutely, Your Honor. I will absolutely do that. And, you know, Your Honor, I think there are several appellate court cases in the context of the destruction of emails and documents. Leon from the Ninth Circuit, the organic kimia case from the Federal Circuit that we cite, along with other courts of appeals cases cited in our decision that expressly say that when you have document destruction of this magnitude, and on Leon it was only 2,200 files. When you have document destruction of this magnitude, there just isn't a way to have a fair trial, even with an adverse inference. And if I could turn just briefly to the second issue in the case about the exclusion of evidence. On the supplemental sanctions issue, the district court denied our motion for supplemental sanctions. That's at JA 101. It's documentary 450. Second, the district court said that this was a closed case. In the new trial opinion at JA 58, the district court expressly said that a jury could reasonably have ruled for us. And so that's what makes the exclusion of undeniably relevant evidence that would have convinced the district court to apply the adverse inference so prejudicial. And I think there's no dispute that this evidence was relevant. The federal rules say that the district court does not have the discretion to exclude relevant evidence unless it's the prejudice, the unfair prejudice substantially outweighs the relevance. And I didn't hear any argument from Mr. Dean that the prejudice from this evidence about their bad faith substantially outweighed the relevance. It's a dual prejudice inquiry. The same point that Judge Fish made as to the Schmidt factor that prejudice under 403 is a duality. It's not just the prejudice to one side, but the prejudice to you also should have been factored in. Well, absolutely. Well, the prejudice to us was denying undenied, was excluding undeniably relevant evidence that would have convinced the jury to apply the adverse inference. And there's a big difference between cross-examining an expert witness by saying, well, did you, you know, would your opinion change if you knew that there were some email deletions and cross-examining an expert witness and saying, would your opinion change if you knew that there were email deletions? And the CEO of the company thought that those emails might have been damning. That's the information that the district court excluded and other information like that. And there was just no question, the court cannot say that it is highly probable that the jury would not have applied the adverse inference or that they couldn't have come to a different result if they had had this information. And I'd just like to close by looking at what the district court said and why it decided to give an adverse inference. It said that the jury has to decide whether this was part of a massive cover-up or whether Plantronics genuinely believed that it was innocent, but just worried that a jury would misunderstand the emails. And if that's the district court's reasoning, it was an abuse of discretion to exclude the evidence that would have allowed us to prove that it was a massive cover-up. Thank you, Your Honor.  Thank you very much, Counsel, for a well-argued case, an interesting case. We'll take it under review.